**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>KALOBIOS PHARMACEUTICALS, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-12628 (LSS) |
| GREGORY REA, RTAT LLC, EDWARD H. PAINTER, NANCY RETZLAFF, and ARMISTICE CAPITAL MASTER FUND, LTD.,<br><br>               Plaintiffs,<br><br>    v.<br><br>KALOBIOS PHARMACEUTICALS, INC.,<br><br>               Defendant. | Adv. Pro. No. 16-_____ (LSS) |

**COMPLAINT**

Gregory Rea, RTAT LLC, Edward H. Painter, Nancy Retzlaff, and Armistice Capital Master Fund, Ltd. (collectively, the "Plaintiffs"), by their undersigned counsel, for their complaint against Defendant KaloBios Pharmaceuticals, Inc. ("KaloBios" or the "Company") hereby allege as follows:

**NATURE OF THE ACTION**

1.      This action arises out of an unconsummated private placement of unregistered shares of KaloBios common stock in December 2015.  KaloBios fraudulently induced Plaintiffs to participate in the proposed private placement by making knowingly false representations in the governing Securities Purchase Agreement (as defined more fully below, the "SPA").  Principal among these falsehoods, KaloBios expressly represented that neither the Company nor

any director or officer thereof is or has been the subject of any action or investigation involving a claim of violation of securities laws, and further, that it was not aware of any pending criminal or civil investigations that could have a material adverse effect on its business.  While making these representations out of one side of its mouth, it appears that the Company's Chief Executive Officer and Chairman of the Board of Directors, Martin Shkreli, and its outside counsel, was negotiating out of the other side with both the Federal Bureau of Investigation and the U.S. Securities and Exchange Commission regarding their imminent indictment, arrest, and prosecution.

2.      After inducing participation in the proposed placement on false pretenses, and only a matter of hours before federal agents arrested both Shkreli and the Company's outside counsel, KaloBios hastily announced that the transaction contemplated by the SPA—the sale of common stock to the Plaintiffs—had closed.  KaloBios knew this statement was false because it had not complied with the express preconditions to closing required by the SPA.  In particular, as detailed in this Complaint, representations and warranties were false, required deliverables were not provided to Plaintiffs, and material adverse effects were present.  Moreover, upon information and belief, several of the potential investors never even wired the required funds. For example, upon information and belief, both Shkreli and KaloBios' own financial advisor were going to purchase stock through SPAs, but had not wired funds prior to the arrest on December 17.  KaloBios nonetheless claimed that the transaction had closed as pretext to justify its wrongful retention of the $8,083,194 that parties had sent to KaloBios in anticipation of the transaction's consummation.

3.      To date, KaloBios has rebuffed repeated requests by Plaintiffs for the return of the funds paid in connection with the contemplated private placement.  Instead of returning the

funds, on December 29, 2015, in furtherance of its efforts to rebuff Plaintiffs, the Company filed a voluntary petition (the "Petition") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").  In this action, Plaintiffs seek a ruling returning them to the status quo ante through a declaratory judgment that the transaction never closed, and that the funds (which are held in a resulting or constructive trust) are being wrongfully retained by KaloBios, are not property of the estate, and should be immediately returned to Plaintiffs.  Alternatively, Plaintiffs seek damages and other relief for the Company's fraud, breach of contract, and unjust enrichment.

**THE PARTIES**

4.      Plaintiff Gregory Rea is an individual residing in Florida.

5.      Plaintiff RTAT LLC is a limited liability company organized under the laws of the State of Delaware.

6.      Plaintiff Edward H. Painter is an individual residing in New York.

7.      Plaintiff Nancy Retzlaff is an individual residing in New Jersey.

8.      Plaintiff Armistice Capital Master Fund, Ltd. (the "Master Fund") is a Cayman Islands corporation engaged in the business of investing in securities.  Non-party Armistice Capital, LLC ("Armistice Capital") serves as the investment manager to the Master Fund.

9.      Defendant KaloBios Pharmaceuticals, Inc. is a Delaware corporation with a registered office at 3500 South DuPont Highway, Dover, Delaware 19901.  Incorporating Services, Ltd. is the registered agent for KaloBios.  The Company's registered common stock traded on The NASDAQ Global Market under the symbol "KBIO," but has been halted since on or about December 17, 2015.

## THE COMPANY'S MANAGEMENT

10.     Non-party David Moradi was elected to the board of directors of KaloBios on November 19, 2015.  He is currently serving in that capacity.  Moradi has wrongfully refused to direct KaloBios to return the money owed to Plaintiffs.

11.     Non-party Michael Harrison was appointed to the board of directors of KaloBios on November 22, 2015.  He is currently serving in that capacity.Harrison has wrongfully refused to direct KaloBios to return the money owed to Plaintiffs.

12.     Non-party Martin Shkreli was until recently Chief Executive Officer of KaloBios and Chairman of its board of directors.  On November 17, 2015 Shkreli, Moradi (through Anthion Partners II LLC, a private investment vehicle of which Moradi is the Managing Member) and Marek Biestek (collectively, the "Control Group") acquired over 50.1% of Kalobios' outstanding common stock through open market purchases.  On November 19, 2015, Shkreli was elected to the board and appointed Chairman and CEO of the Company.  As of November 25, 2015, the Control Group had acquired 2,890,000 shares (or 70.1%) of Kalobios' outstanding common stock for an aggregate purchase price of $4,554,609.21.  Exhibit A, Schedule 13D filed November 25, 2015.  On December 17, 2015, shortly after his arrest on various securities charges (detailed below), Shkreli was terminated as CEO of KaloBios and resigned from his position as a member of the Company's board of directors.

13.     Non-party Marek Biestek was elected to the board of directors of KaloBios on November 19, 2015.  He resigned from that position on December 27, 2015.

14.     Non-party Tom Fernandez was appointed to the board of directors of KaloBios on November 22, 2015.  He resigned from that position on December 27, 2015.

15.     Non-party Evan Greebel served as outside counsel to KaloBios (while at the firm Kaye Scholer LLP) prior to his arrest on December 17, 2015 (detailed below).

4

## JURISDICTION AND VENUE

16.    The United States Bankruptcy Court for the District of Delaware (the "Court")

has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

17.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

18.    This is a core proceeding.  To the extent the Court determines that the matters are

non-core, Plaintiffs consent to entry of final orders or judgments by the Court.

## SUBSTANTIVE ALLEGATIONS

### The Background Of The Challenged Transaction

19.    In early December 2015, Kalobios' CEO, Martin Shkreli, contacted Plaintiffs

about participating in a private placement of unregistered shares of KaloBios common stock.

Shkreli described the deal as one that would involve an at-market offering.  As of December 1,

2015, the Company's common stock was trading at approximately $34.83 per share.

20.    On or about December 3, 2015, KaloBios' financial advisor sent Plaintiffs a

Securities Purchase Agreement (the "SPA").  Exhibit B.

21.    The SPA set the per share purchase price for the offering at $29.32, subject to

adjustment for subsequent reverse and forward stock splits, stock dividends, stock combinations,

and other similar transactions.

### The Stock Purchase Agreement's Closing Conditions

22.    Section 2.1 of the SPA required that the parties fulfill their contractual obligations

by the Closing Date, defined in Article I as "in no event later than the third Trading Day

following the date hereof."  The SPA was dated Thursday, December 3, 2015, meaning the

Closing Date was set to be no later than December 8, 2015.

5

23.     Section 2.1 further stated, "On or prior to the Closing Date . . . the Company shall deliver to each purchaser its respective Shares . . . and the Company and each Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing."

24.     Section 2.2 required that the Company deliver four documents at closing: (1) a copy of the SPA "duly executed by the Company"; (2) a "legal opinion of Company Counsel" in an agreed-upon form; (3) a copy of irrevocable instructions to the Company's transfer agent instructing it to deliver the Purchasers' stock certificates; and (4) a copy of an accompanying registration rights agreement "duly executed by the Company."

25.     Section 2.3(b) expressly conditioned closing on the "delivery by the Company of the items set forth in Section 2.2(a) of this Agreement."

26.     Section 2.3(b) also conditioned Plaintiffs' obligation to close on the absence of a "Material Adverse Effect with respect to the Company since the date hereof[.]"  This clause contained no modifier requiring that the Company have knowledge of events that could lead to a Material Adverse Effect.  Simply put, any Material Adverse Effect – like the arrest of the Company's controlling stockholder, Chairman, and CEO, Martin Shkreli – would nullify Plaintiffs' obligation to perform.

27.     Section 2.3(b) also conditioned closing on "the accuracy ***in all material respects*** when made and on the Closing Date of the representations and warranties of the Company contained herein (unless as of a specific date therein)" (emphasis added).

**The Stock Purchase Agreement's Representations And Warranties**

28.     In Section 3.1(j), the Company represented and warranted that "[n]either the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action [defined to include an action, suit, inquiry, notice, violation, proceeding or investigation]

involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty" (emphasis added).In that subsection, the Company also represented that "[t]here has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the [Securities and Exchange] Commission of the Company or any current or former director or officer of the Company."

29.     In Section 3.1(j), the Company also represented and warranted that,  "[e]xcept as set forth in Schedule 3.1(j), there is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company . . . before or by any court, arbitrator, governmental or administrative agency or regulatory authority . . . which . . . would, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect."  Schedule 3.1(j) stated: "None."

30.     Additionally, in Section 3.1(i), the Company represented and warranted that "[s]ince the date of the latest audited financial statements included within the SEC Reports, except as disclosed in a subsequent SEC Report filed prior to the date hereof or as set forth on Schedule 3.1(i): (i) there has been no event, occurrence or development that has had or that would reasonably be expected to result in a Material Adverse Effect."  Schedule 3.1(i) stated: "None."

**Plaintiffs Execute The SPA And Send Funds To KaloBios**

31.     Beginning on December 3, 2015, KaloBios' financial advisor sent Plaintiffs disclosure schedules, instructions for wiring payment, a registration rights agreement (the "Registration Agreement"), and instructions for Plaintiffs to execute and return the documents.

32.     In compliance with the instructions received from KaloBios' financial advisor, each of the Plaintiffs executed and returned the SPA and the Registration Agreement.

33.    Also in compliance with the instructions received from KaloBios' financial advisor, Plaintiffs collectively delivered approximately $5,399,972.46 (the "Funds") to an account in the name of KaloBios at Comerica Bank, 333 W. Santa Clara Street, San Jose, California 95113.

34.    Specifically, Plaintiffs delivered the Funds as follows:

(a)    Gregory Rea delivered approximately $3,000,000.00 on or about December 4, 2015, for the purchase of 120,700 shares of common stock of KaloBios (at the amended price, as described below).

(b)    RTAT LLC delivered approximately $650,000.00 on or about December 9, 2015, for the purchase of 26,151 shares of common stock of KaloBios (at the amended price, as described below);

(c)    Edward H. Painter delivered approximately $125,000.00 on or about December 16, 2015, for the purchase of 5,029 shares of common stock of KaloBios (at the amended price, as described below);

(d)    Nancy Retzlaff delivered approximately $125,000.00 on or about December 7, 2015, for the purchase of 5,029 shares of common stock of KaloBios (at the amended price, as described below); and

(e)    The Master Fund delivered approximately $1,500,000.00 on or about December 4, 2015, for the purchase of 60,350 shares of common stock of KaloBios (at the amended price, as described below).

35.    All Plaintiffs sent funds to KaloBios intending that the Funds would be kept segregated and held in trust by KaloBios pending the closing of the transactions contemplated by the SPA.

**The December 16 SPA Amendment**

36.    On or about December 16, 2015, KaloBios' financial advisor sent Plaintiffs Amendment No. 1 to Securities Purchase Agreement (the "SPA Amendment") and requested that they execute and return the SPA Amendment.  Exhibit C.

37.    The amendment lowered the per-share price of the offering for all purchasers that were not directors, officers, employees or consultants of KaloBios to $24.855, subject to

adjustment for subsequent reverse and forward stock splits, stock dividends, stock combinations, and other similar transactions.

38.     KaloBios' financial advisor advised Plaintiffs that the shares would be by book entry transfer and that the agent would be sending Plaintiffs a statement.  To date, Plaintiffs have received no such statement.

**Behind The Scenes At KaloBios**

39.     Unbeknownst to Plaintiffs, the FBI was knocking at the door.  A federal investigation of Shkreli had been underway since at least January 2015, when Retrophin Inc. ("Retrophin"), a biopharmaceutical company that Shkreli had founded, received a subpoena from prosecutors seeking information about its relationship with Shkreli.

40.     KaloBios and Shkreli knew that he was the subject of federal scrutiny.  In August 2015, Retrophin filed suit against Shkreli in a case captioned Retrophin Inc. v. Shkreli, 15-cv-06451 (S.D.N.Y. 2015).  Retrophin alleged criminal activity that was later reflected in the Department of Justice's criminal indictment of Shkreli.  For example, the complaint alleges that "Shkreli used his control over Retrophin to enrich himself, and to pay off claims of MSMB investors (who he had defrauded)."

**The Company Purports To Close The Transaction**

41.     In the evening of December 16, 2015, KaloBios filed with the SEC a Form 8-K, stating that the transactions set forth in the SPA "were consummated" on December 16, 2015, and that 350,224 shares of the Company's common stock were issued to purchasers subject to their respective SPA versions for "the aggregate purchase price of approximately $8,818,000." Exhibit D.

42.     KaloBios' assertion that the transactions set forth in the SPA "were consummated" on December 16, 2015 was false and materially misleading.  KaloBios had not fulfilled its obligations under the SPA or completed conditions precedent to the closing of the transaction, and it cannot fulfill all such conditions now.

43.     For example, KaloBios had failed to deliver to Plaintiffs a copy of the SPA executed by the Company, a legal opinion of Company Counsel addressed to each Purchaser, a copy of the irrevocable instructions to the Transfer Agent, or an executed Registration Rights Agreement as required by Section 2.2 of the SPA.

44.     KaloBios had also failed to comply with Section 2.1, which required it to deliver the purchased shares and make the closing deliveries on or prior to the Closing Date, which was to be December 8, 2015, at the latest.

45.     Upon information and belief, several of the potential investors never even wired the funds required to purchase the stock that the Company intended to issue pursuant to the SPA. For example, upon information and belief, both Shkreli and KaloBios' own financial advisor were going to purchase stock through SPAs, but had not wired funds prior to the arrest on December 17.

46.     Moreover, KaloBios could not truthfully confirm the "accuracy in all material respects when made and on the Closing Date of the representations and warranties of the Company" as required by Section 2.3(b)(i) of the SPA.

47.     In particular, the Company's representation in Section 3.1(j) of the SPA that neither it "nor any director or officer . . . is or has been the subject of any Action [including any investigation] involving a claim of violation of or liability under federal or state securities laws

or a claim of breach of fiduciary duty" was materially and knowingly false when made and at the supposed closing.

48.     So was the Company's representation in Section 3.1(j) that "[t]here has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the [SEC] of the Company or any current or former director or officer of the Company."

49.     The Company's representation in Section 3.1(j) of the SPA regarding the absence of any "action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company . . . before or by any court, arbitrator, governmental or administrative agency or regulatory authority . . . which . . . would, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect" was also materially and knowingly false when made and at the supposed closing.

50.     As of the supposed closing, KaloBios could not truthfully confirm that there had "been no Material Adverse Effect with respect to the Company since [the date of the SPA signing]" as required by Section 2.3(b)(iv) of the SPA.

51.     Specifically, the Company's representation in Section 3.1(i) of the SPA regarding the absence of any "event, occurrence or development that has had or that would reasonably be expected to result in a Material Adverse Effect" was materially and knowingly false when made and at the supposed closing.

52.     By December 16, 2015, KaloBios, through Shrkeli, its outside counsel and potentially others, knew or should have known about the FBI investigation, the gravity of the potential charges, and the fact that Shkreli's and its outside counsel's arrest was imminent.

53.     KaloBios made these knowingly false representations to induce Plaintiffs to invest.  The money involved was significant.  The $8.8 million allegedly raised in the purported private placement dwarfed the roughly $4.5 million that it cost the Control Group to purchase a 70.1% stake in the Company, and it was nearly as great as the $10 million in equity financing promised by Shkreli and his investor group just weeks prior (discussed below).

**The Truth About KaloBios Emerges**

54.     At approximately 6:30 a.m. on December 17, 2015 (the very next morning after the purported closing of the transaction contemplated by the SPA), FBI agents arrested Shkreli on charges of securities fraud, securities fraud conspiracy, and wire fraud conspiracy for orchestrating interrelated schemes to defraud investors in MSMB Capital Management LP and MSMB Healthcare Management LP, and a scheme to misappropriate assets of Retrophin.  Later that day, Shkreli was terminated as CEO of KaloBios and resigned from his position as a member of its board of directors.

55.     On December 17, 2015, FBI agents also arrested Evan Greebel, then-outside counsel to KaloBios, on the charge of wire fraud conspiracy for his role in the Retrophin scheme with Shkreli.

56.     The SEC also filed a related civil complaint against Shkreli, Greebel, and others in the United States District Court for the Eastern District of New York.

57.     In addition to its more obvious effects on the day-to-day operations of the Company, Shkreli's arrest constituted a Material Adverse Effect on KaloBios because it imperiled financing key to the Company's operations.  In its Form 8-K dated November 23, 2015, the Company attached a November 19, 2015 press release announcing that Shkreli and his investor group had committed to a $10 million equity financing facility, subject to applicable

stockholder approval.  This financing commitment was critical given the Company's previously announced restructuring disclosed in a Form 8-K dated November 5, 2015.

58.    The Company's registered common stock traded on The NASDAQ Global Market under the symbol "KBIO," but has been halted since on or about December 17, 2015.

59.    On December 18, 2015, KaloBios received a letter from The NASDAQ Stock Market LLC ("Nasdaq"), which stated that the Nasdaq Listing Qualification Staff (the "Nasdaq Staff") had determined to delist Kalobios' common stock.  The Nasdaq Staff cited a number of reasons for their decision, including the recent criminal indictment and arrest of Shkreli, the Company's controlling stockholder, former Chairman, and former Chief Executive Officer, based on allegations of securities fraud, among other things, as well as the arrest and indictment of the Company's former outside counsel, based on similar allegations, and the civil complaint from the U.S. Securities and Exchange Commission filed against Shkreli and Greebel based on similar allegations.

60.    The deadline for the Company to request an appeal expired on December 28, 2015.  Upon information and belief, the Company requested an appeal of the delisting decision on December 28, 2015.  The Company's appeal will be heard by NASDAQ on February 25, 2016.

61.    Additionally, on December 30, 2015, the Company received another letter from NASDAQ notifying the Company that the Nasdaq Staff had determined that the Company's filing for protection under chapter 11 of the Bankruptcy Code on December 29, 2015 constituted a separate and additional basis for delisting the Company's securities.  The letter further stated that the resignations of Tom Fernandez and Marek Biestek as members of the Company's board of directors on December 27, 2015 resulted in the Company having only one remaining member

on its audit committee, which also served as a separate and additional basis for delisting the Company's securities.

62.    Furthermore, upon information and belief, the University of California at Davis and Moffitt Cancer Center in Florida have suspended a planned drug trial sponsored by the Company.

**Plaintiffs Take Action; The Company Stalls**

63.    As soon as Plaintiffs learned of the criminal proceedings against Shkreli, they began contacting the Company, Kaye Scholer, LLP (listed in the SPA as counsel to KaloBios) and KaloBios' financial advisor.

64.    Plaintiffs engaged in repeated conversations with Kalobios' management, former management and current attorneys and expressly and repeatedly requested the return of the Funds that Plaintiffs sent to KaloBios.

65.    For example, at least one of the Plaintiffs, the Master Fund, contacted Kaye Scholer, KaloBios' financial advisor, and the Company's management on December 17, 2015 when it learned about the arrest, and asked them about the status of the offering, stating the Master Fund's view that the transaction had not closed, and requesting its portion of the Funds back.  Subsequently, on December 22, 2015, the Master Fund spoke with Alan Dye once it became aware that he then represented the Company.  On December 17, 2015, the Master Fund also requested that its broker, UBS Securities LLC, initiate a wire recall, which they did and were informed that someone at the Company would need to approve the recall.  No one at the Company did so.

66.    Plaintiffs came to the conclusion that the transactions described in the SPA had not been consummated—despite the representations by KaloBios to the contrary.  Accordingly,

they redoubled their effort to engage the Company and its advisors in an effort to retrieve the delivered Funds.

67.     In spite of Plaintiffs' repeated attempts to communicate with the Company regarding the importance of returning the sent funds, the Company ignored Plaintiffs for days.

68.     After continued silence through the weekend, Company counsel finally contacted Plaintiffs just before midnight on Sunday, December 27 – just two days before the Company filed its Petition.

69.     In that Sunday night email, Company counsel expressed to Plaintiffs as well as the other parties to the SPAs the Company's interest "in having [a] meeting as soon as Tuesday, December 29, if a sufficient number of Purchasers indicate an interest in meeting."

70.     But the Company was simply buying time.  When contacted by counsel for Plaintiffs, Company counsel declined to say anything substantive and simply indicated he needed to speak to his client.

71.     If not for the Company's delay tactics – filing a false and misleading Form 8-K and failing to confer with Plaintiffs in a timely manner regarding the failed transaction – Plaintiffs would have filed suit against the Company long before the filing of the Petition.

72.     To date, KaloBios has refused to return the Funds that Plaintiffs sent to the Company to be held in trust until closing in reliance on the Company's materially and knowingly false statements.

73.     Instead, on December 29, 2015, the Company initiated this bankruptcy proceeding in an attempt to prevent Plaintiffs from recovering their Funds.

74.     Plaintiffs learned of the bankruptcy filing on December 30, 2015.

## COUNT I
### Declaration That The Funds Are Held In A Resulting Trust
### And Are Not Property Of The Estate
### (Delaware Common Law; 28 U.S.C. §§ 959, 2201, & 2202; and 11 U.S.C. § 541)

75.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though set forth fully herein.

76.     Plaintiffs sent the Funds to the Company prior to the closing of the transactions contemplated by the SPA.

77.     It was presumed that the Funds would be held in trust pending the closing of the transactions contemplated by the SPA.

78.     Standard practice in these circumstances would be to have the funds escrowed until closing.

79.     In delivering the Funds, Plaintiffs did not intend for the Company to have a beneficial interest in the Funds until after the preconditions to closing were satisfied and the closing of the transactions contemplated by the SPA occurred.

80.     The preconditions to closing under the SPA were not satisfied.

81.     The transactions contemplated by the SPA never closed.

82.     The SPA is terminated as a result of its failure to close by the Closing Date.

83.     Nonetheless, the Company took the Funds meant to be paid upon closing of the transactions contemplated by the SPA.

84.     The Company has not returned the Funds to Plaintiffs.

85.     A nexus exists between the res of the resulting trust (i.e., the Funds), and the Debtor's bank account, because that is the account into which the Funds were deposited upon receipt by the Debtor.

86.     Additionally, at no point after the Funds were deposited into the Company's account did the balance in such account fall below the amount of the Funds.

87.     Plaintiffs seek a declaration from the Court that the Company holds the Funds in a resulting trust for the benefit of Plaintiffs, that the Funds are traceable, that the Funds are not property of the Estate, that the transactions contemplated by the SPA never closed, that the SPA is terminated, and that the Funds, plus pre- and post-judgment interest, must be returned to Plaintiffs.

## COUNT II
### In The Alternative To Count I, Declaration That The Funds Are Held In A Constructive Trust And Are Not Property Of The Estate (Delaware Common Law; 28 U.S.C. §§ 959, 2201, & 2202; and 11 U.S.C. §541)

88.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if set forth fully herein.

89.     Plaintiffs sent the Funds to the Company prior to the closing of the transactions contemplated by the SPA.

90.     The Funds were intended to be used to pay the purchase price due by Plaintiffs to the Company upon closing of the transactions contemplated by the SPA.

91.     The Company fraudulently induced Plaintiffs to enter into the SPA and wire the Funds to the Company.

92.     The Company would be unjustly enriched if permitted to retain the Funds.

93.     The transactions contemplated by the SPA never closed.

94.     The SPA is terminated as a result of its failure to close by the Closing Date.

95.     Nonetheless, the Company took the Funds meant to be paid upon closing of the transactions contemplated by the SPA.

96.     The Company has not returned the Funds to Plaintiffs.

17

97.     A nexus exists between the res of the constructive trust (i.e., the Funds), and the Debtor's bank account, because that is the account into which the Funds were deposited upon receipt by the Debtor.

98.     Additionally, at no point after the Funds were deposited into the Company's account did the balance in such account fall below the amount of the Funds.

99.     Plaintiffs seek, as an alternative to Count I, a declaration that the Company holds the Funds in constructive trust for the benefit of Plaintiffs, that the Funds are traceable, that the Funds are not property of the estate, that the transactions contemplated by the SPA never closed, that the SPA is terminated, and that the Funds, plus pre- and post-judgment interest, must be returned to Plaintiffs.

## COUNT III
### Fraud Arising Out Of The SPA
### (Delaware Common Law)

100.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though set forth fully herein.

101.     KaloBios falsely represented or omitted facts that KaloBios had a duty to disclose because those facts were material to Plaintiffs' decision to purchase shares under the SPA.

102.     KaloBios knew or believed that the representations were false, or, alternatively, made the representations with reckless indifference to the truth.

103.     KaloBios intended to induce Plaintiffs to purchase shares so that KaloBios could gain operating capital.

104.     Plaintiffs justifiably relied on these representations by contracting for closing conditions that were contingent on the representations' truth.

105.     Plaintiffs were injured by their reliance, and are entitled to damages.

## COUNT IV
### Breach Of Contract
### (Delaware Common Law)

106.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if set forth fully herein.

107.    To the extent that the SPA was not vitiated by KaloBios' fraud, Plaintiffs entered into a contract with KaloBios.

108.    The contract provided that, in exchange for their investments, Plaintiffs would receive shares of KaloBios common stock whose value was contingent on the accuracy of the representations and warranties contained in the SPA.

109.    Plaintiffs performed under the contract by sending funds to KaloBios.

110.    KaloBios failed to perform its obligations under the contract, including by failing to close the transaction by the date specified in the contract and by failing to satisfy the agreed-upon closing conditions, as set forth in the body of this Complaint.  KaloBios did not even provide to Plaintiffs the promised shares of common stock.

111.    KaloBios breached the representations and warranties in the SPA.

112.    Plaintiffs were injured by the Company's breach of the SPA and are entitled to damages.

## COUNT V
### In The Alternative To Count V, Unjust Enrichment
### (Delaware Common Law)

113.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though set forth fully herein.

114.    KaloBios was enriched by the delivered payments made by Plaintiffs.

115.    Plaintiffs were impoverished without justification or, at best, when they received shares of KaloBios that were less valuable than represented.

116.    Plaintiffs are entitled to a return of the Funds plus pre- and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Enter a declaratory judgment imposing a resulting trust over the Company's account in the amount of the Funds, in order to implement the parties' presumed intent;

(b)    Alternatively, enter a declaratory judgment imposing a constructive trust over the Company's account in the amount of the Funds, on account of the Company's fraud;

(c)    Enter a declaratory judgment that the transactions contemplated by the SPA never closed, and that the SPA is terminated;

(d)    Compel KaloBios to return all amounts paid by Plaintiffs to KaloBios, plus pre- and post-judgment interest;

(e)    Enter a judgment in favor of Plaintiffs and against the Company based on the Company's fraud;

(f)    Enter a judgment in favor of Plaintiffs and against the Company based on the Company's breach of the SPA;

(g)    Enter a judgment in favor of Plaintiffs and against the Company based on the Company's unjust enrichment from the receipt of the Funds;

(h)    Award damages sustained by Plaintiffs as a result of Kalobios' fraud, breach of contract, conversion, and/or unjust enrichment;

(i)    Award Plaintiffs all reasonable attorneys' fees and costs;

(j)    To the extent the transactions contemplated by the SPA closed, rescind those transactions in their entirety, cancel the shares sold to Plaintiffs, and take all other steps necessary to return the parties to the status quo ante; and

(k)     Award such further legal and equitable relief as this Court may deem just and proper.

January 7, 2016                              WOMBLE CARLYLE SANDRIDGE & RICE, LLP

                                            /s/ Matthew P. Ward
                                            Matthew P. Ward (Del. Bar No. 4471)
                                            Ericka F. Johnson (Del. Bar No. 5024)
                                            Morgan L. Patterson (Del. Bar No. 5388)
                                            222 Delaware Avenue, Suite 1501
                                            Wilmington, DE 19801
                                            Telephone:  (302) 252-4320
                                            Facsimile:  (302) 252-4330
                                            E-mail:  maward@wcsr.com
                                            E-mail:  erjohnson@wcsr.com
                                            E-mail:  mpatterson@wcsr.com

                                            *Attorneys for Plaintiffs*

WCSR 35503038v11